**24**                    CASES IN THE SUPREME COURT

Anthony et al. vs. Peay et al.                    JULY

ANTHONY ET AL. VS. PEAY ET AL.

The heir cannot maintain a suit, in equity or at law, for the unpaid purchase money of land sold by his deceased ancestor, though there may have been no administration on his estate. (*Lemon's heirs vs. Rector et al.* 15 *Ark. Rep.* 436.)

It is a fatal defect in a decree for the purchase money of land sold by a person since deceased and for which the purchaser has not received a deed, to require him to make full payment, while he is to receive title to the premises from less than the whole number of heirs of the deceased vendor.

Where a party to a bill in equity avails himself of a legal defence, for the first time, in the appellate court, it is the usual course of equity practice to tax him with costs.

A bill will not be dismissed "without prejudice" where there is not much probability that the complainant could derive any benefit from further litigation.

*Appeal from the Circuit Court of Pulaski county in Chancery.*

The Hon. WILLIAM H. FEILD, Circuit Judge.

PIKE & CUMMINS for the appellants.

FOWLER for the appellees.

Mr. Justice SCOTT delivered the opinion of the court.

The original bill was filed by Samuel D. Blackburn, against all these parties as well as others. Upon the hearing it was dismissed, and no appeal was taken. It will be unnecessary, therefore, in the view we take of the case presented by the appeal before us, to state its purport. The cross bill constitutes the suit out of which all the questions presented to this Court arise.

It was not an independent cross-bill, but the joint answer of the Peays to Blackburn's original bill, containing special interrogatories touching numerous allegations against the appellants,

James C. Anthony, the Bank of the State of Arkansas, William Field and other co-defendants in the original bill.

It set out that Juliet Peay was the only child and heir at law of Letitia Neill. That they were both dead. That the heirs of Juliet Peay were Gordon N. Peay and themselves, her children, and George N. Pope and Ann Neill Pope, her grand children. The mother of the latter, Mary G. (wife of William F. Pope,) being dead. It may be also stated here, that Major Peay, the father of some of these heirs, and the grand-father of the others, was also dead; that during the progress of the cause, the two children of Mr. Pope died also, and that both of the suits were abated as to them, upon suggestion and proof of their death, but in neither was Wm. F. Pope made a party, either complainant or defendant. Gordon N. Peay released all interest that he might have in the controversy, to his brothers and sisters, and filed his disclaimer.

The complainants in the cross-bill then proceed to set out a great variety of matters at considerable length—the entire transcript sent up numbering near five hundred pages. But the point upon which the cause must inevitably be determined, can be presented by a brief general statement. Letitia Neill, the grand-mother of the Peays, complainants in the cross-bill, was the owner, in fee simple, of the lots upon which is the "Anthony House" in the city of Little Rock. She borrowed from the State Bank, divers sums of money to expend in the erection of the buildings, and at different times executed two several mortgages upon the property to the Bank, with power of sale. Intervening in point of time between these two, she executed a third mortgage to McQuaid. Besides these mortgage liens, mechanic's liens were also fixed upon the property. Mrs. Neill was also otherwise indebted; and finding herself much embarrassed before the completion of the buildings, she leased the property, thus encumbered, to James C. Anthony for a term of five years, at the rate of two thousand dollars per annum to be paid by him quarterly, with a stipulation that he should complete the improvements and reimburse himself out of the fifth

26      CASES IN THE SUPREME COURT

Anthony et al. vs. Peay et al.      JULY

year's rent. Her creditors seem not to have been satisfied to wait to be thus paid. Anthony failed to pay his first quarterly instalment of rent. Suit had been instituted by Brown, who held a lien alleged to be paramount to the mortgage lien of the Bank, and the property was levied upon and sold at his suit. The Bank also proceeded to sell under her mortgages. The proceedings of both are alleged to be irregular and invalid. During all this time, it is alleged that Anthony and his confederates were continually endeavoring to purchase the property; at the same time he delayed and finally refused outright to pay the rent due by him. Finding no other mode of relief, she yielded to the solicitations of Anthony and his confederates, and sold him the property at the price of twenty thousand dollars—she covenanting to make to him title in fee simple with the usual covenants of warranty, and Anthony covenanting, simultaneously, to assume, and pay to the State Bank, the whole of her indebtedness, estimated at about nine thousand dollars; also her indebtedness to William Brown, estimated at three thousand, three hundred dollars; also her indebtedness to the estate of Ann L. Byrd, dec'd, estimated at seven hundred and eighty-nine dollars and seventy-six cents, and any other debts she might direct and require, not exceeding the whole of the purchase money altogether—deducting, however, from the amount of the purchase money, in the first instance, the price of a tract of land, being $1,600, and the price of two negro men, being $2,000, and the price of certain horses, cattle and hogs, being $500, which Anthony covenanted to convey to, and deliver into the possession of Thomas W. Newton, in trust, for Mrs. Juliet Peay during her life, and at her death to her children, share and share alike: and any residue of the purchase money not used in the payment of the debts specified, and to be specified, and not thus deducted therefrom, Anthony to pay to Newton, upon the same trusts, in equal instalments at 6, 12, 18 and 24 months, in Arkansas Bank notes, and secure the payment of the same by mortgage upon real estate.

Anthony being in possession under his lease, retained it un-

der this purchase, there being a further stipulation in the contract of purchase and sale, that, in the event of his failure to comply; the rent was to accrue, as under the lease; otherwise, it was to cease. A memorandum of debts to be paid by Anthony, seems to have been furnished him by Pope, as agent for Mrs. Neill, upon which appear, not only the debts above specified, but also a further debt to McQuaid of $3,000, one to Woodruff of $226, one to L. N. Clark of $249 65, one to Simpson of $255 40, and one to Morrison & Sullivan of $400. The Brown debt being put down upon this memorandum in two items: *First*, the amount of his *lien* upon the property, $2,135 12; and, *secondly*, his debt not secured by lien, $1,200.

It seems that Anthony, in a short time, having but partially complied with his covenant, became so embarrassed that he, in his turn, was also compelled to sell the property. Before doing so, however, he had assumed in the Bank the amount of Mrs. Neill's indebtedness, and also an amount which extinguished Brown's lien debt (on account of which, the Bank had bought the property, and by quit claim released it to Anthony upon his aforesaid assumpsit,) and other liabilities of Mrs. Neill, to an aggregate sum of over twelve thousand dollars.

He sold the property to Philip L. Anthony, and also sold him all his real and personal estate in Arkansas, except certain lands, horses, cattle and farming utensils, the land which he had agreed to secure in trust for Mrs. Peay, and one of the negroes. In consideration, Philip, with James Lawson, jr. as his security, bound himself to secure to him for his life, the use of certain negroes under a deed of trust made in Virginia, to pay his Bank debt, also certain debts due by him to the Real Estate Bank, and to exonerate him from all liabilities incurred by him in the State of Arkansas up to that period.

Afterwards, upon Mrs. Peay's relinquishing, as well as Mrs. Neill, all interest in one of the negro men, which he had agreed to convey in trust for Mrs. Peay and her children, he conveyed the other negro man and the tract of land, according to his covenant with Mrs. Neill. His pretence for requiring this relin-

28        CASES IN THE SUPREME COURT

Anthony et al. vs. Peay et al.                    [July

quishment as to one of the negroes, was, that his several assumpsits of Mrs. Neill's debts, the liens upon the property and his advances for her, added to the value of the land, and the one negro conveyed, were equal to the whole purchase money of the Anthony house property. It seems that the property in question was afterwards mortgaged to Mrs. Mary S. Anthony, and was afterwards conveyed in trust to Albert Pike, and ultimately fell into the hands of John Brown; but it will be unnecessary to pursue its history any further.

The cross bill, proceeding to allege that no administration had ever been had on either the estate of Mrs. Neill, or of Mrs. Peay, and that no debts existed against either, prayed answers, and an account, and that, after giving to J. C. Anthony credit for all actually due him, including $1,600 for the land, and $1,000 for the negro, complainants might have a decree against him, P. L. Anthony and James Lawson, with enforcement of lien for the same on the premises, and sale thereof under decree for satisfaction.

It seems unnecessary to state all the answers to the cross-bill. Pike, Mary S. Anthony, Philip, and James C. Anthony and Field, all filed their answers. James C. Anthony, among other things, answers that on the 3d of September, 1843, he effected a final settlement with Mrs. Neill, and obtained her receipt in full satisfaction of his covenants on the purchase of the Anthony House property. And he exhibited with his answer such a receipt endorsed on the back of the original covenant, to which the name of Pope and wife appear as witnesses, and along with it, he exhibited a statement of various sums, which he had assumed and otherwise advanced for Mrs. Neill, on account of this purchase, and of rents for the property, amounting to the aggregate sum of $21,061. This receipt was assailed by the cross-bill as a forgery, and testimony was introduced for and against it. There was considerable other testimony taken as to other matters, which it will be unnecessary to set out.

The Court below, upon the whole case that was before it, dismissed the original bill, and denied Blackburn all relief; with

which we have nothing to do, as already remarked—no appeal as to that having been taken: and upon the cross-bill decreed that the sales under the mortgages and under Brown's judgment, were null and void, and canceled them, and the conveyances under them. And then decreed that the complainants had a lien upon the property for all of the $20,000 remaining unpaid, with interest, according to the contract of sale, adjudging that the evidence did not prove it to have been paid in full, and that the unpaid balance ought to be paid to the complainants, and if not paid within a reasonable time, the property ought to be sold for the payment of it. It was, therefore, referred to a special master to take an account of what was so still due to the complainants, as heirs and legal representatives of Juliet Peay and Letitia Neill, upon said contract of sale and purchase, in doing which he should be guided by said contract, and allow only such payments as had been made, under the stipulations, or by express directions of Mrs. Neill: and that this should be done according to the depositions already taken and on file, and not suppressed or declared incompetent: resorting to additional testimony, to be taken in writing, only to explain or elucidate facts already in part established by the pleadings and evidence: and that he allow to Anthony, without further proof, the several items of sugar, coffee, bacon, corn and other like articles of necessary family supplies, annexed to and exhibited with his answer, applying the several credits at their respective dates, and computing interest up to the first day of the succeeding term, when report was to be made. And it was further decreed, that upon the confirmation of the report, or of its modification and final adjustment, James C. Anthony should pay the ascertained balance, and upon his failure to do so, or the failure of the bank, Philip L. Anthony, Mary S. Anthony, or Albert Pike to do so for him, the property to be sold by the master, and the title of all the parties to be conveyed by him to the purchaser: And in case of payment without sale, then the complainants should execute to Anthony a deed in fee for the property, subject to the rights of the other defendants, who have

purchased under him, or under the bank. And all the costs in the cross-suit were decreed against James C., Philip L. and Mary S. Anthony, the Bank and Pike, jointly—no decree having been entered as to Lawson, although the bill as to him had been before taken as confessed.

The master reported, allowing as credits, for the Bank debts $8,660, and interest $2,055 01: Brown's debt, $1,200; McQuaid's debt, $3,000; Walters' (adm. of Byrd) judgment of $748 82; Woodruff's judgment $230 65; Clark's $240 16; Simpson's $253 82. Land $1,600; negro, $1,000; bacon and family supplies, and one yoke of oxen, $152 74; in all—$19,580 55; and he made the balance, if payable in specie, $748 57; if in Arkansas bank paper, then its specie value, $561 43.

He stated this account upon the testimony in the case, as passed upon by the Court, and indicated in the decree; no further testimony having been offered him. He excluded from the account, not only family supplies, but all other sums that appeared to have been payments on account of *rents*, or for *repairs* or *improvements* of the premises, considering all such matters as not embraced in the order of reference.

To this report the complainants excepted: *first*, as to the allowance of the McQuaid debt, $3,000: *secondly*, as to $748 82, amount of the Watkins debt; *thirdly*, as to $230 65, the Woodruff debt; *fourthly*, the Clark debt, $240 16; *fifthly*, the Simpson debt, $253 82,—upon the ground that, as to the Watkins debt, the evidence showed that only $454 50 had been actually paid, and as to the other three, that there was no evidence that they had ever been paid. The Court sustained these exceptions, and again referred the matter to the master, directing him to allow of these items only such sums as the evidence shows to have been actually paid by James C. Anthony, or other persons for him, under the stipulations of the contract of sale and purchase, or by express directions of Mrs. Neill or her agents. The residue of the report was confirmed, and the appellants appealed to this Court.

The principles, applicable as well in equity as at law, upon

which the decree must be held erroneous, are declared in the case of *Lemon's heirs vs. Rector et al.*, 15*th Ark. Rep.* 436. The recovery of the supposed balance of purchase money ought to have been sought by an administration. These heirs were not entitled to recover it. Whether the Court below adjudged correctly, that a balance of the purchase money for the Anthony House, upon the sale and purchase by Mrs. Neill and J. C. Anthony, was still unpaid: and whether or not, the special master accurately ascertained this balance, we have not considered with any view to absolute determination—these questions being totally immaterial to that presented by the case; because, although this may be all so, these heirs are not to be allowed to recover such balance, either at law or in equity, according to the doctrine of the case above cited.

The rights of heirs and distributees are subordinate to the rights of creditors of a deceased person: and the law intervenes between them an officer of its own, whose functions they have no warrant to usurp at will. Although these heirs, apparently *pro forma*, aver in their cross-bill, that there are no debts or liabilities against either of the estates of Letitia Neill or Juliet Peay, the case made by them distinctly shows that this is not true. On the contrary, their exceptions to the master's report, which the Court sustained, proceed, openly, upon the ground that there are debts against the estate of Letitia Neill, which have never been paid.

Thus, not content with the master's report, which exhibited a balance, which they might have been ultimately entitled to, after the satisfaction of creditors—including of course, and subject to any deduction therefrom, necessary to liquidate any balance due J. C. Anthony on account of overpayments by him of the rent, which, the master reports, was excluded from his computation—they sought by these exceptions to recover moneys to which they had not the slightest claim, either at law or in equity, because in equity belonging to these creditors, whose rights were paramount to theirs.

If Courts of equity could permit such parties to usurp the

functions of administrators, they could, consistently with the principles upon which they proceed, do so only upon the condition that the fund should be brought into Court, and then, under its immediate supervision and sanction, administered according to the administration law of the land.

And besides this insuperable objection to the decree, there are several other minor ones equally fatal to it, that are obvious. Its effect is to require a full payment of the purchase money by Anthony, while he and those under him are to receive title to the premises, with an exoneration from the mortgage lien upon it as declared by the Court, from less than the whole number of heirs, who have such lien, if the decree stands: because Wm. F. Pope is not included among those required to convey to Anthony, and he, by law, takes from his deceased children not only their interest in the purchase money, but also the security for it. It disregarded J. C. Anthony's clear legal right to set off any claim of his for overpayment on account of rents, by way of advancements and improvements upon the premises, against Mrs. Neill or these heirs claiming under her. Although it might be conceded, as claimed by these complainants, that these charges of Maj. Anthony for improvements, were, by the terms of the lease, to be deducted out of the fifth years rent, yet it would not follow that, because the lease was afterwards abrogated by the sale, he was not to be paid at all.

Why the Court below should have allowed the master to take into his computation bacon, sugar, coffee, and other family supplies, and forbid him as to other advances, and for the expenditures for improvements upon the premises, we have not been enabled to divine.

As against creditors of Mrs. Neill, these complainants are but donees, and yet this decree, in effect—upon a bill, to which some of them are not even made defendants, and when no executor or administrator is made a defendant to protect the rights of creditors:—so perverts the law, as to make the rights of these donees paramount and prior to those of creditors.

The decree, as well as other portions of the proceedings, is

open to other observations and just criticism: but it seems unnecessary to pursue the matter further, as the case must go off, as we have said, upon the doctrines of the case above cited.

But as these doctrines were not invoked by the appellants, until since the case has come into this court, it seems an equitable ground upon which to withhold costs from them. They ought, at least, to have raised this question at the hearing below, in order to have exonerated themselves from a liability to be taxed with costs upon a reversal here for such a cause, according to the usual course of equity practice. *Epps v. Van Denson* 4 *Paige R.* 76, *and cases there cited.* *Hitchcock v. Scribner*, 3 *Johns. Cases* 321. *Clark v. Long*, 4 *Randolph R.* 452. *Shepherd's Exr. v. Stark*, 3 *Munf. R.* 29. *Richardson's Exr. v. Hunt*, 2 *Ib.* 148. *Whiting v. U. S. Bank*, 13 *Peter's R.* 14. *Harding v. Hardy*, 11 *Wheaton R.* 104.

We shall accordingly reverse the decree and dismiss the cross-bill, at the costs of the appellants, both in this Court and the Court below. And although, within our discretion, we might direct this dismissal to be without prejudice to any rights of these complainants, as heirs of Mrs. Neill and Mrs. Peay, against the defendants in the cross-bill; yet from the pleadings and evidence in the cause, which we have looked through, there is so much reason for believing that further litigation would only subject them to useless and unnecessary expense, from which there is not much probability they could derive any benefit, that this course would seem but encouragement to fruitless litigation. Of course creditors of Mrs. Neill, or any administrator upon her estate, cannot be affected in any way by this dismissal.

English C. J., not sitting in this case.